UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COMERICA INC.,

                    Plaintiff,

v.                                                          Case Number: 06-10353
                                                            Honorable David M. Lawson

ZURICH AMERICAN INSURANCE CO. and
HOUSTON CASUALTY CO.,

                    Defendants.
_____/

## OPINION AND ORDER DENYING PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Comerica, Inc., a financial services corporation (i.e., bank), entered into a settlement of five securities fraud class action lawsuits (which had been consolidated into two actions) for $21 million. Comerica's primary insurance carrier, Federal Insurance Company – which disputed coverage on at least some of the claims on various grounds and whose policy carried a $20-million limit of liability – ultimately agreed to pay $14 million toward the settlement, leaving Comerica to pay the other $7 million, which it did. Defendant Zurich American Insurance Company wrote a following form excess insurance policy that was triggered "after all such 'Underlying Insurance' has been reduced or exhausted by payments for losses." Comerica sought $1 million plus costs of defense ($2.6 million) from defendant Zurich under the excess policy in connection with the class action settlements. Zurich refused to pay on the grounds that the primary coverage had not been exhausted, and it did not believe that damages paid pursuant to section 11 of the Securities Act of 1933 were covered by the primary policy or the excess policy. Comerica brought suit against Zurich for payment under the excess policy, and the matter is presently before the Court on cross motions for summary judgment. Zurich seek dismissal of the case in its motion on the ground that coverage

has not been triggered by exhaustion of the liability limits on the Federal policy. Comerica disputes

that argument, and it moves for partial summary judgment in its original and amended motions

seeking a determination that section 11 damages are covered. The Court heard the parties'

arguments in open court on January 8, 2007 and now finds that the plain language of the excess

policy issued by Zurich requires exhaustion of the primary insurance's liability limits by actual

payment of losses by the primary insurer before the excess policy is triggered. Since Federal's $20

million liability limit was not exhausted by payment of $14 million on the claim by Federal, Zurich

has no obligation to Comerica under the excess policy. Therefore, the defendant's motion for

summary judgment will be granted and the plaintiff's motions for partial summary judgment will

be denied.

## I.

In 2002, Comerica was named as a defendant in five class action lawsuits alleging that the

company made false and misleading statements as to its financial condition that resulted in economic

loss to purchasers of its stock and persons who received Comerica stock as part of a merger. The

nature of the claims is discussed in more detail below, but Comerica turned to its insurers when it

came time to defend and attempt to settle the litigation.

Federal Insurance Company was Comerica's primary insurance carrier. It had issued a claims

made policy with a "Policy Period" of January 1, 2002 to January 1, 2003 and a liability limit of $20

million. The policy provided coverage for executive liability and indemnification "for a Wrongful

Act committed, attempted, or allegedly committed or attempted by such Insured Person before or

during the Policy Period," Def.'s Mot. Summ. J. Ex. 2, Federal Policy at Insuring Clause 1 & 2, and

for organizational liability on account of "a Wrongful Act committed, attempted, or allegedly

committed or attempted by an Insured Person or the Organization before or during the Policy

Period." Def.'s Mot. Summ. J. Ex. 2, Federal Policy at Endorsement 6 (insuring clause 3). The

policy defines "Wrongful Act" to mean:

> a. For purposes of coverage under Insuring Clauses 1 or 2, any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted, by an Insured Person, individually or otherwise, in his Insured Capacity, or any matter claimed against him solely by reason of his serving in such Insured Capacity;
> b. For purposes of coverage under Insuring Clause 3, any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted, by an Insured Person or the Organization based upon, arising from, or in consequence of a Securities Transaction.

Def.'s Mot. Summ. J. Ex. 2, Federal Policy at Endorsement 6.

The policy also contained a provision that allocated defense and indemnity expenses in the

event that both covered and non-covered losses arose from a securities transaction, as follows:

> If a Claim based on, arising from or in consequence of a Securities Transaction covered, in whole or in part, under Insuring Clauses 2 or 3 results in both Loss covered by this Policy and loss not covered by this Policy, because such Claim includes both covered and uncovered matters or is made against both covered and uncovered parties, the Insured Persons, Organization and the Company shall allocate such amount to Loss as follows:
> i.    100% of such amount constituting defense costs shall be allocated to covered Loss; and
> ii.   100% of such amount other than defense costs shall be allocated to covered Loss.

Def.'s Mot. Summ. J. Ex. 2, Federal Policy at Endorsement 6. "Securities transaction" is defined

in the policy as "the purchase or sale of, or offer to purchase or sell, any securities issued by the

Organization." *Ibid*. The Federal policy also contained a "Defense and Settlement" provision that

required Comerica to cooperate with Federal, entitled Federal to participate in the defense, and

prohibited Comerica from settling a case without Federal's written consent.

Defendant Zurich was Comerica's excess insurance carrier under a following form policy

with a policy period of January 1, 2002 through January 1, 2003 and a liability limit of $20 million.

As a following form policy, coverage under the Zurich policy was no broader than the Federal

policy, except of course for the liability limits. It contained the following provisions:

> I. INSURING AGREEMENT
> The "Insurer" shall provide the "Insured(s)" with excess insurance coverage over the "Underlying Insurance" as set forth in Item 3. of the Declarations during the "Policy Period" set forth in Item 4. of the Declarations. Coverage hereunder shall attach only after all such "Underlying Insurance" has been reduced or exhausted by payments for losses and shall then apply in conformance with the same provisions, limitations, conditions and warranties of the "Primary Policy" at inception, except for premium limit of liability and as otherwise specifically set forth in the provisions of this Policy. In no event shall coverage under this Policy be broader than coverage under any "Underlying Insurance."
> . . .
> V. DEPLETION OF UNDERLYING LIMIT(S)
> In the event of the depletion of the limit(s) of liability of the "Underlying Insurance" solely as a result of actual payment of loss thereunder by the applicable insurers, this Policy shall . . . continue to apply to loss as excess over the amount of insurance remaining. . . . In the event of the exhaustion of the limit(s) of liability of such "Underlying Insurance" solely as a result of payment of loss thereunder, the remaining limits available under this Policy shall . . . continue for subsequent loss as primary insurance . . .
> This Policy only provides coverage excess of the "Underlying Insurance." This policy does not provide coverage for any loss not covered by the "Underlying Insurance" except and to the extent that such loss is not paid under the "Underlying Insurance" solely by reason of the reduction or exhaustion of the available "Underlying Insurance" through payments of loss thereunder . . .

Def.'s Mot. Summ. J. Ex. 3, Zurich Policy at 2-3.

The Zurich policy required Comerica to maintain the underlying Federal insurance during

the policy period:

> III. MAINTENANCE OF "UNDERLYING INSURANCE"
> All of the "Underlying Insurance" scheduled in Item 3. of the Declarations shall be maintained during the "Policy Period" in full effect, except for any reduction of the aggregate limit(s) of liability available under the "Underlying Insurance" solely by reason of payment of loss thereunder. Failure to comply with the foregoing shall not

invalidate this Policy but the "Insurer" shall not be liable to a greater extent than if this condition had been complied with.

Def.'s Mot. Summ. J. Ex. 3, Zurich Policy at 2. It also required Zurich's consent before settlement and provided Zurich with a right to participate in the defense of a claim even if the underlying policy had not been exhausted:

VI. CLAIM PARTICIPATION
The "Insured(s)" shall not admit liability, consent to any judgment, or agree to any settlement which is reasonably likely to involve the Limit of Liability of this Policy without the "Insurer's" consent, such consent not to be unreasonably withheld.

Def.'s Mot. Summ. J. Ex. 3, Zurich Policy at 3.

Comerica's troubles began when it issued a press release on July 17, 2002 announcing its financial results for the 2002 second quarter. Apparently the results were quite good, and a number of people bought Comerica stock after the announcement. The results were also incorrect. On October 2, 2002, Comerica announced a $213 million after-tax charge to earnings based on credit losses and good will impairment. The Securities and Exchange Commission then began investigating Comerica. Shortly thereafter, five securities class action lawsuits were filed against Comerica by classes of shareholders that purchased Comerica shares outright and those who had received Comerica shares when Comerica acquired Imperial Bancorp. The lawsuits were consolidated into two cases, referred to by the parties as the Comerica Securities Litigation and the Imperial Securities Litigation.

The plaintiffs in the Comerica Securities Litigation had purchased Comerica stock between July 17, 2002 (the date Comerica issued the press release) and October 1, 2002 (the day before Comerica announced the charge to earnings). These plaintiffs alleged that Comerica had been manipulating earnings by inflating loan ratings, and that the senior vice president of loan

adjustments at Comerica's California Bank had been instructed to hide non-performing loans in the first half of 2002. The plaintiffs claimed to have been misled by Comerica's July 17 press release and other false statements made from July 17 through October 1, 2002. They alleged that Comerica's loan review process was inadequate; its loan-loss reserves were lower than required by federal regulations because they were based on over-inflated loan ratings; it lacked adequate internal controls and was therefore unable to ascertain the true financial condition of the company; and the value of Comerica's net income and financial results were materially overstated by $23 million in the second quarter of 2002. They alleged that Comerica had knowledge of these facts or recklessly disregarded them. The complaint contained two counts: count one alleged violation of section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5; and count two alleged violation of section 20(a) of the Securities and Exchange Act of 1934 against the individual defendants in that litigation, who were all controlling persons at Comerica.

The plaintiffs in the Imperial Securities Litigation were investors in Imperial Bancorp. Comerica acquired Imperial on January 29, 2001 as a result of a stock exchange. Imperial shareholders were issued 21 million shares of Comerica stock, resulting in an exchange rate of 0.46 shares of Comerica for each share of Imperial stock. This gave Imperial shareholders 12 percent of the combined company. Those plaintiffs alleged that Comerica omitted material facts from the information it gave to Imperial shareholders to induce Imperial shareholders to approve the transaction. The false and misleading information related to the value of Munder Capital, of which Comerica owned 95 percent. The plaintiffs claimed that they received inadequate consideration for their Imperial stock. The Imperial Securities Litigation included claims against Comerica and its CEO, Ralph Babb, for violations of sections 11, 12(2), and 15 of the Securities Act of 1933 and for

violations of sections 14(a) and 20(A) of the Securities and Exchange Act of 1934. Among other relief, the Imperial class plaintiffs sought to tender their Comerica shares and rescind the sale, and those who since had sold their stock sought recision damages.

In September 2004, Comerica and the securities plaintiffs entered into settlement discussions. They agreed to mediation and asked Federal and Zurich to participate. In late September 2004, Federal refused to consent to the mediation. Federal expressed concerns about Comerica's litigation activities, which Federal believed violated the policy's cooperation and consent requirements. On October 5, 2004, Federal wrote to Comerica that it was concerned

> (1) that you apparently have apprised the court that settlement discussions will occur without previously receiving Federal's views; and (2) that you selected and [sic] a mediator and scheduled a session without Federal's input on the mediator or the date. . . .
> Particularly since you contemplate the use of Policy proceeds in connection with any settlement, the twin obligations of cooperation and obtaining Federal's consent to any settlement preclude such unilateral steps toward settlement. Policy, Section 9. Moreover, pursuant to Federal's right to associate in the defense of the pending litigation, Policy, Section 9, our client objects to any further efforts to proceed without closely consulting Federal in advance.

Def.'s Mot. Summ. J. Ex. 9, Letter from D. Standish to W. Stern and T. Holleman (Oct. 5, 2004).

On October 22, 2004, Federal wrote to Comerica again to object to the mediation, which was scheduled for October 27, 2004, and accused Comerica of "flout[ing] the cooperation and association clauses." Def.'s Mot. Summ. J. Ex. 11, Letter from D. Standish to W. Stern and T. Holleman (Oct. 22, 2004). Federal also complained that Comerica was wrongfully refusing to provide it with materials related to the SEC investigation.

In late October, Comerica and the securities plaintiffs engaged in mediation. Geoffrey Heineman, counsel for Zurich, attended the mediation. The plaintiffs in the securities litigation gave presentations of their positions. Zurich has submitted an affidavit from Mr. Heineman in the present

case stating that the presentation regarding the Imperial Securities Litigation was entirely focused on the plaintiffs' claims under section 11 of the 1933 Securities Act, which called for disgorgement of wrongfully acquired gains by Comerica. Apparently, Federal contested whether those claims were covered losses under the primary policy because they amounted to restitution of money Comerica obtained by its fraudulent earnings statements and therefore did not constitute a "loss" to Comerica.

Eventually, Comerica and the securities plaintiffs agreed to a $21 million settlement, contingent upon insurer approval. Of the $21 million, $6 million was intended to go to the Imperial Securities Litigation plaintiffs, and the remaining $15 million was to go to the Comerica Securities Litigation plaintiffs. By then, Comerica had incurred $2.6 million in defense costs. In early November 2004, Federal refused to consent to the settlement. Comerica then offered to let Federal look at certain documents, referred to as "Federal Reserve Board materials," but Federal would not be permitted to make copies of the documents or take verbatim notes. Discussions continued, but Federal continued to have three main concerns about the settlement. First, Federal believed Comerica had breached its cooperation obligation, in part by selectively disclosing information so that Federal had no way of knowing if significant, exculpatory evidence had been left undisclosed. Second, Federal believed the $6 million allocated for the Imperial Securities Litigation plaintiffs was not covered by the policy because it was restitutionary. Finally, Federal believed Comerica may have made misrepresentations during the underwriting process for the policy. Federal wrote,

> As you may know, Federal moved from an excess position into the primary position for the 2002 to 2003 policy year. As part of the underwriting for that policy, Federal sought and received a broad range of representations and assurance from Comerica. Indeed, Federal sought – and received – specific assurances in December 2001 about the adequacy of the loan loss provisions at a time when regulators apparently were criticizing the adequacy of Comerica's reserving practices. Given the materiality of

the information to Federal, which its underwriting inquiries underscore, and its relevance to the hazard assumed, a basis appears to exist to rescind the policy altogether.

Def.'s Mot. Summ. J. Ex. 18, Letter from D. Standish to T. Burns (Dec. 17, 2004).

On December 20, 2004, Zurich wrote to Comerica, concurring in Federal's position that Comerica had breached its cooperation obligations and that the payment to the Imperial Securities plaintiffs was not covered. Zurich also concluded that the Federal policy had not been exhausted and payment was not due under the excess policy. Zurich wrote to Comerica,

> Under the foregoing circumstances, the settlement for which you request consent does not implicate the Zurich policy. Indeed, since at most only 15 million of the proposed $21,000,000 settlement could possibly be considered a loss as that term is defined in the primary policy, the primary policy will not be exhausted. As the primary policy is not exhausted and the settlement does not reach Zurich's attachment point of $20,000,000 (not including retention(s)), the Zurich policy is not implicated. Under the foregoing circumstances, Zurich neither takes nor needs to take a position with regard to Comerica's settlement proposal.

Def.'s Mot. Summ. J. Ex. 19, Letter from G. Heineman to T. Burns (Dec. 20, 2004).

On December 30, 2004, Federal and Comerica settled their coverage dispute, agreeing that Federal would pay $14 million towards the settlement of the underlying litigation. They agreed that "the policy shall be deemed fully exhausted and is null and void and has no force or effect whatsoever." Def.'s Mot. Summ. J. Ex. 20, Settlement and Release Agreement.

Comerica then turned to Zurich and demanded payment of $1 million plus costs of defense in the amount of $2.6 million under the excess policy. Zurich again refused to pay because Comerica did not exhaust its policy with Federal and because the section 11 damages are not covered. On January 26, 2006, Comerica filed a four-count complaint. Count one alleges breach of contract against defendant Zurich. Counts two and three seek declaratory judgment against

defendant Zurich. Count four alleges anticipatory repudiation against defendant Houston. Houston Casualty Company was served but never answered and is not presently involved in the litigation.

On October 2, 2006, defendant Zurich filed a motion for summary judgment. Zurich argues that it is not obligated to pay under the plain and unambiguous language of the insurance policy, which required Federal to actually pay $20 million to or on behalf of Comerica before Zurich's coverage was triggered. Comerica filed a response arguing that Zurich repudiated the excess policy, and that Zurich's argument is contrary to public policy and inconsistent with the policy as a whole. Comerica further argues that Zurich has not been harmed by any non-fulfillment of the Federal policy's conditions.

On November 6, 2006, the plaintiff filed a cross motion for partial summary judgment and then an amended cross motion for partial summary judgment. Comerica argues that damages under section 11 of the Securities Act constitute loss under the insurance policy. Zurich filed a response taking the opposite position.

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The parties have filed cross motions for summary judgment, which might imply that there are no facts in dispute. Nonetheless, the Court must apply the well-recognized standards when deciding such cross motions; "[t]he fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate." *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003). Therefore, when this Court considers cross motions for summary judgment, it "must evaluate

each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

A motion for summary judgment under Fed. R. Civ. P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In this case, the parties agree that the facts are not in dispute, except, perhaps, the question whether certain language in the Zurich policy is ambiguous. Rather, they disagree as to legal implications that flow from the facts. The Court can decide as a matter of law whether the insurance contract is ambiguous. *Old Life Ins. Co. of Am. v. Garcia*, 411 F.3d 605, 613 (6th Cir. 2005) (holding that "[w]hether ambiguity exists in the terms of a contract is a question of law for the court to decide"). Summary judgment is an appropriate procedure to resolve this dispute.

The case is before the Court on the basis of diversity jurisdiction, 28 U.S.C. § 1332, and the parties agree that Michigan law furnishes the rules for decision. An insurance policy is a contract and the usual rules of construction apply. *Murphy v. Seed-Roberts Agency, Inc.*, 79 Mich. App. 1, 7, 261 N.W.2d 198 (1977) ("Policies of insurance are much the same as other contracts; they are matters of agreement by the parties and the job of the courts is to determine what that agreement was and enforce it accordingly.") (citation omitted). Under Michigan law, an insurance policy is to be

enforced according to its plain language. "[P]olicy language in an insurance contract is to be accorded its ordinary meaning unless it is apparent from a reading of the whole instrument that a different or special meaning was intended." *Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 943-44 (6th Cir. 1993) (citing *Sump v. St. Paul Fire & Marine Ins. Co.*, 21 Mich. App. 160, 175, 175 N.W.2d 44 (1970), *disapproved of on other grounds by Lewis v. Metropolitan Life Ins. Co.*, 397 Mich. 481, 245 N.W.2d 9 (1976)).

"If the provisions of a policy are clear and unambiguous, the court applies the terms in their 'plain, ordinary, and popular sense.'" *Old Life Ins. Co.*, 411 F.3d at 613 (quoting *Clevenger v. Allstate Ins. Co.*, 443 Mich. 646, 654, 505 N.W.2d 553 (1993)) (citation omitted). An unambiguous contract is not open to construction and must be enforced as written. *Cochran v. Ernst & Young*, 758 F. Supp. 1548, 1554 (E.D. Mich. 1991). But "if an insurance policy provision is ambiguous, a reviewing court construes it against the drafting insurer and in favor of the insured." *Old Life Ins. Co.*, 411 F.3d at 613 (citing *Mich. Mut. Ins. Co. v. Dowell*, 204 Mich. App. 81, 87, 514 N.W.2d 185 (1994)). "Thus, the insurance company has an obligation to *clearly express* any limitations in its policy." *Ford Motor Credit Co. v. Aetna Cas. & Sur. Co.*, 717 F.2d 959, 961 (6th Cir. 1983) (emphasis added).

> Ambiguity may not be read into a policy where it does not exist:
>
> When interpreting insurance policies under Michigan law, we are guided by a number of well-established principles of construction. Foremost among those is the maxim that an insurance policy must be enforced in accordance with its terms. *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 207, 476 N.W.2d 392 (1991). A court may not read ambiguities into a policy where none exist.

*Michigan Millers Mut. Ins. Co. v. Bronson Plating Co.*, 445 Mich. 558, 519 N.W.2d 864, 868 (1994), *overruled on other grounds by Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 664 N.W.2d

776 (2003). An unambiguous contract must be enforced unless it violates public policy. *Vanguard Ins. Co. v. Clarke*, 438 Mich. 463, 471, 475 N.W.2d 48 (1991), *overruled on other grounds by Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 664 N.W.2d 776 (2003). "A contract is ambiguous when its terms are reasonably and fairly susceptible to multiple understandings and meanings." *Equitable Life Assurance Soc'y of the U.S. v. Poe*, 143 F.3d 1013, 1016 (6th Cir. 1998) (citing *Parameter Driven Software, Inc. v. Mass. Bay Ins. Co.*, 25 F.3d 332, 336 (6th Cir. 1994)). Disagreement among the parties as to the meaning of a contract term does not necessarily create ambiguity as a matter of law. *Steinmetz Elec. Contractors Ass'n v. Local Union No. 58 Int'l Bhd. of Elec. Workers, AFL-CIO*, 517 F. Supp. 428, 432 (E.D. Mich. 1981). To determine whether an ambiguity exists, the court must read the insurance policy as a whole. *See Murphy*, 79 Mich. App. at 8, 261 N.W.2d at 201.

As mentioned, the defendant believes that its summary judgment motion proves that the clear and unambiguous terms of the insurance policy do not require it to pay the plaintiff. The plaintiff disputes this argument on three grounds. First, it states that Zurich repudiated its policy when it asserted that the section 11 claims by the Imperial Securities Litigation plaintiffs are not covered under the policy. The plaintiff claim it was justified in settling the underlying securities suits as it saw fit once Zurich repudiated by unequivocally declaring its intent not to perform, and therefore it was excused from meeting the exhaustion requirement. Second, the plaintiff argues that Zurich is obligated to pay for the amount of the settlement above the $20 million limit of the Federal policy because the failure to do so violates public policy by causing delay and encouraging litigation. The plaintiff cites *Zeig v. Massachusetts Bonding & Ins. Co.*, 23 F.2d 665 (2d Cir. 1928), and several

other cases that follow *Zeig* in support of that proposition. Third, the plaintiff claims that the Zurich policy is ambiguous because of the following sentence:

> The 'Insurer' shall provide the 'Insured(s)' with excess insurance coverage over the 'Underlying Insurance' as set forth in Item 3. of the Declarations during the 'Policy Period' set forth in Item 4. of the Declarations.

Compl. Ex. B, Insurance Agreement at I. Comerica insists that because this provision contains no instruction on whether the Federal insurer must itself pay losses, the policy is ambiguous, and according to the plaintiff, the rest of the policy does nothing to clarify the issue.

The Court finds that the plaintiff cannot prevail on any of these arguments.

## A. Repudiation

There is no question that a condition precedent to Zurich's obligation to pay on the excess policy is that Comerica incur losses that exhaust the primary insurance. The plaintiff contends that Zurich repudiated the contract by telling the plaintiff that it would not pay because section 11 claims were not covered and that the limits of the primary insurance therefore would not be exhausted by the payment on covered losses. Comerica believes this "repudiation" excuses it from fulfilling the condition precedent. Zurich responds by stating that it simply gave the wrong reason for denying coverage, while reserving all of its other policy defenses. The correct reason is that Comerica's own payment of $6 million towards the Federal limit does not trigger Zurich's obligation to pay when the primary insurer did not pay on losses to the full extent of its policy limits.

Comerica cites black letter contract law in support of its repudiation argument. It is unquestionably true that "'[u]nder the doctrine of anticipatory breach, if a party to a contract, prior to the time of performance, unequivocally declares the intent not to perform, the innocent party has the option to either sue immediately for the breach of contract or wait until the time of

performance.'" *Paul v. Bogle*, 193 Mich. App. 479, 493, 484 N.W.2d 728, 735 (1992) (quoting

*Brauer v. Hobbs*, 151 Mich. App. 769, 776, 391 N.W.2d 482 (1986)). But that argument is quite

wide of the mark in the context of the facts of this case. In *Baker v. Abramson*, 2005 WL 3304563,

*2 (Mich. App. 2005) (unpublished), cited by the defendant, the Michigan Court of Appeals quoted

the following passage from Williston on Contracts that addresses the concept of repudiation when

the opposite party's failure to meet a condition precedent is unaffected by the so-called repudiation:

> "It is essential that the promisor's conduct in repudiating the contract be the cause
> of the promisee's failure to perform a condition precedent. Thus, the rule excusing
> the nonoccurrence of conditions precedent where there has been a repudiation of the
> contract by the party whose performance is conditional does not apply when the
> promisee could not or would not have performed the condition in any event, that is,
> whether or not the promisor repudiated the contract. In other words, the repudiation
> must have caused or substantially contributed to the nonoccurrence of the condition.
> If the condition would not have occurred in any event, its nonoccurrence is not
> excused. In such a case, both parties are discharged from their duty to perform the
> contract."

*Id.* at *2 (quoting *Williston on Contracts*, § 39.41, pp 690-691).

In this case, it is not entirely clear that Zurich's position amounted to a repudiation, that is,

an "absolute" and "unequivocal" declaration of an intention not to perform. *Combs v. Intern'l Ins.*

*Co.*, 354 F.3d 568, 599 (6th Cir. 2004). Rather, Zurich's stance more accurately is characterized as

a belief that Comerica had not yet fulfilled the condition precedent on the excess policy, so the time

for Zurich's performance had not yet arrived. In all events, Comerica presumably obtained

everything it could from Federal, who was not willing to pay more than $14 million. This payment

was the result of a settlement of a dispute with the primary insurer who appeared to contest even

first-dollar coverage, let alone exposing its entire policy limit. The alleged repudiation by Zurich

did not cause Comerica not to exhaust the Federal policy; Federal's refusal to pay $20 million

-15-

caused Comerica to not fulfill the condition.  Therefore, Comerica is not excused from complying with the condition precedent by Zurich's conduct, however it is characterized.

## B.  Public policy argument

Comerica insists that its own payment of $6 million toward the settlement filled the gap between Federal's payment and the balance of the policy limit, and that should serve as the functional equivalent of exhausting the primary policy limit because it exposes Zurich to no greater liability than if Federal had made the payment.  The foundation of its argument is *Zeig v. Massachusetts Bonding & Ins. Co.*, 23 F.2d 665 (2d Cir. 1928), and cases based on that decision.

In *Zeig*, an excess insurance contract required that the underlying policy be exhausted but was silent about whether the full amount of the underlying policy needed to be collected or actually paid out before the excess policy was triggered.  The opinion is not clear about why the underlying policy was not collected, but presumably it was due to a settlement.  The Second Circuit held that the underlying policy was exhausted by discharge under the settlement, and therefore the excess policy was implicated.  The court concluded that the insurance company had not been prejudiced and public policy encouraged settlement:

> The defendant argues that it was necessary for the plaintiff actually to collect the full amount of the policies for $15,000, in order to 'exhaust' that insurance.  Such a construction of the policy sued on seems unnecessarily stringent.  It is doubtless true that the parties could impose such a condition precedent to liability upon the policy, if they chose to do so.  But the defendant had no rational interest in whether the insured collected the full amount of the primary policies, so long as it was only called upon to pay such portion of the loss as was in excess of the limits of those policies.  To require an absolute collection of the primary insurance to its full limit would in many, if not most, cases involve delay, promote litigation, and prevent an adjustment of disputes which is both convenient and commendable.  A result harmful to the insured, and of no rational advantage to the insurer, ought only to be reached when the terms of the contract demand it.
> We can see no reason for a construction so burdensome to the insured.  Nothing is said about the 'collection' of the full amount of the primary insurance.  The clause

provides only that it be 'exhausted in the payment of claims to the full amount of the expressed limits.' The claims are paid to the full amount of the policies, if they are settled and discharged, and the primary insurance is thereby exhausted. There is no need of interpreting the word 'payment' as only relating to payment in cash. It often is used as meaning the satisfaction of a claim by compromise, or in other ways. To render the policy in suit applicable, claims had to be and were satisfied and paid to the full limit of the primary policies. Only such portion of the loss as exceeded, not the cash settlement, but the limits of these policies, is covered by the excess policy.

*Zeig*, 23 F.2d at 666.

The cases that follow *Zeig* generally rely on an ambiguity in the definition of "exhaustion" or lack of specificity in the excess contract as to how the primary insurance is to be discharged. *See, e.g., Stargatt v. Fid. and Cas. Co. of New York*, 67 F.R.D. 689 (D. Del. 1975) (construing excess policy that took effect "only when the Primary Policy in the amount of $250,000 . . . has been exhausted" to mean that "[t]he settlement under a primary policy of claims equaling the amount of the policy permits recovery on a secondary policy made applicable only where the primary insurance is exhausted in payment of claims"); *Gasquet v. Commercial Union Ins. Co.*, 391 So. 2d 466 (La. Ct. App. 1980) (holding that an excess policy that did not become effective "unless and until the insured, or the insured's underlying insurer, shall have paid the amount of the underlying limits on account of such occurrence" was triggered by a settlement that gave the excess carrier "a 'credit' for the policy limits of the primary insurer"). Other cases reaching similar results decided under Michigan law generally deal with overlapping coverage of automobile insurance and priority disputes over which policy shall be deemed "excess." *See, e.g., Smit v. State Farm Mut. Auto Ins. Co.*, 207 Mich. App. 674, 525 N.W.2d 528 (1994) ("We agree with the trial court that it is not necessary to exhaust the limits of the primary policy insuring the owner in order to proceed with a claim for excess coverage available under a second policy insuring the driver."); *Allstate Ins. Co. v. Riverside Ins. Co. of Am.*, 509 F. Supp. 43, 46 (E.D. Mich. 1981) (holding that "while recovery

under the primary policy is a prerequisite to pursuit of the excess coverage, it is not necessary to exhaust the first policy in order to proceed with a claim under the second policy so long as actual damages in the amount of the primary policy are shown"); *Detroit Auto. Inter-Ins. Exch. [DAIIE] v. Joseph*, 67 Mich. App. 393, 241 N.W.2d 221 (1976) (same).

A different result occurs when the policy language is more specific. For instance, in *Danbeck v. Am. Family Mut. Ins. Co.*, 245 Wis. 2d 186 (2001), the plaintiff was riding a bicycle when he was struck by a vehicle whose driver had $50,000 worth of liability insurance through Country Mutual. The plaintiff had $100,000 of uninsured motorist insurance through American Family Mutual under a policy that attached "only after the limits of liability under any **bodily injury** liability bonds or policies have been exhausted by payment of judgements or settlements." *Id.* at 190, 629 N.W.2d at 152. The plaintiff settled with the driver and Country Mutual for $48,000 and agreed to give American Family credit for the whole $50,000. American Family then refused to pay the uninsured motorist claim because the plaintiff had not exhausted the full $50,000 limit against Country Mutual. The plaintiff sued American Family. The Wisconsin Supreme Court held that the Country Mutual policy had not been exhausted and American Family was therefore not required to pay under the unambiguous terms of the insurance policy:

> We agree with American Family and the court of appeals that while the "settlement plus credit" approach to exhaustion has the same practical effect as payment of full policy limits, it is not consistent with the plain language of the policy, which unambiguously requires exhaustion "*by payment of judgements or settlements,*" not "settlement plus credit."

*Id.* at 194, 629 N.W.2d at 154. The court noted the public policy favoring settlement, but stated that this policy, "as important as it is, cannot supersede unambiguous policy language or impose obligations under the contract which otherwise do not exist. The generalized public policy favoring

settlements is insufficient to justify voiding or refusing to enforce the clear language of the policy in this case." *Id.* at 197-98, 629 N.W.2d at 156.

Similarly, in *Wright v. Newman*, 598 F. Supp. 1178, 1196 (D.C. Mo. 1984), the defendant was driving a truck that was towing a car, which came loose from the tow, crossed the center line, killed Tina Wright, and seriously injured Carol and Bonnie Wright. The defendant's employer was authorized to operate as an interstate carrier through American Auto Shippers, Inc., who provided it with $300,000 worth of insurance from Commercial Union Insurance Company. The employer also had a primary insurance policy from Guaranty National Insurance with a limit of $300,000, an excess policy from Bellefonte Insurance Company for $200,000, and an excess policy with a limit of $3,000,000 from Mission Insurance Company. The plaintiffs entered into a partial settlement with the defendant driver and his employer for $300,000, paid to the plaintiffs by Commercial Union. The plaintiffs agreed not to seek satisfaction for any judgment from the defendants' personal assets. The claims then went to a bench trial, at which the plaintiffs were awarded a judgment of $5,775,000. The plaintiffs sought to enforce this judgment against Mission Insurance Company. The Mission policy stated,

> "[l]iability . . . shall not attach unless and until the Primary and Underlying Excess Insurers shall have admitted liability for . . . [their] Limit(s) or unless and until . . . and only after the Primary and Underlying Excess Insurers have paid or been held liable to pay the full amount of . . . [their] Limits,"

*Id.* at 1196. Because neither Guaranty nor Bellefonte had admitted liability or been found liable, Mission argued that its excess policy was not triggered. The plaintiffs responded by citing *Zeig*, stating that Mission had no rational interest in requiring actual payment by Guaranty and Bellefonte. The court found the language of the policy clear and agreed with Mission:

> I could not very well apply *Zeig*'s reasoning here, even if I personally accepted that reasoning, since to do so would appear to run headlong into the clear Colorado rule that an insurance policy must generally be enforced as written. Like the District Court in *Johnson v. Milgo Industrial, Inc*., 458 F. Supp. 297, 301 (D. Minn. 1978), I do not believe *Zeig* can be applied in a situation where – as in this case – the policy contains an express provision requiring resort to underlying insurance.

*Id.* at 1197.

The Court believes that the excess policy in this case likewise requires that the primary insurance be exhausted or depleted by the actual payment of losses by the underlying insurer. Payments by the insured to fill the gap, settlements that extinguish liability up to the primary insurer's limits, and agreements to give the excess insurer "credit" against a judgment or settlement up to the primary insurer's liability limit are not the same as actual payment. Zurich's policy requires "actual payment of losses" by the underlying insurer and states that its "policy does not provide coverage for any loss not covered by the 'Underlying Insurance' except and to the extent that such loss is not paid under the 'Underlying Insurance' solely by reason of the reduction or exhaustion of the available 'Underlying Insurance' through payments of loss thereunder." That never happened in this case.

It is clear that the amount Comerica agreed to pay to the securities litigation plaintiffs potentially implicated Zurich's excess policy because the settlement amount exceeded the primary insurance coverage. But Comerica had a fundamental disagreement with its primary insurer as to whether Federal was liable for *any* amount of the settlement. That dispute did not directly involve Zurich, and Comerica did not have the right to tie Zurich to any aspect of its settlement with Federal without Zurich's consent. Comerica could have litigated its dispute with Federal, which of course would have involved the risk of losing all coverage for the securities liability; but it also could have resulted in a finding that Federal was liable for the entire $20 million, it which case Zurich's

coverage would have been triggered. Comerica seeks the certainty that its settlement brought and the benefit of coverage from its excess carrier as if it had won its dispute with the primary insurer, despite language in the excess policy to the contrary. No public policy argument says that Comerica may have its cake and eat it too.

The *Zeig* court noted that requiring actual payment by the primary insurer by itself does not contravene public policy. Requiring such a condition may guard against collusive settlements with underlying insurers or claimants, and "[i]t is doubtless true that the parties could impose such a condition precedent to liability upon the policy, if they chose to do so." *Zeig*, 23 F.2d at 666. The contract language here states that is exactly what the parties did, and Comerica's argument to the contrary would require a contract rewrite, which this Court is not inclined to do.

### C. Ambiguity

Comerica's argument that the excess policy contains no instruction on whether the primary insurer must itself pay losses to exhaust the underlying insurance, thereby creating an ambiguity, does not withstand a comparison to the insurance document itself. The Zurich policy plainly requires the Federal policy to be exhausted by payment of losses by Federal. Zurich's coverage "shall attach only after all such 'Underlying Insurance' has been reduced or exhausted by payments for losses." Def.'s Mot. Summ. J. Ex. 3, Zurich Policy at 2.

Comerica points to deposition testimony from a Zurich corporate representative concerning the language in the "Depletion of Underlying Limits" section of Zurich's policy as suggesting a lack of clarity in the terminology:

> Q. So would it be fair to say that the first sentence is talking about a situation where a liability doesn't completely exhaust the primary policy and the second sentence is

talking about a situation where a liability does completely exhaust the primary policy?

A. I think it's fair to say that they're addressing those two issues in those two sentences, yes.

Q. Right, but the first sentence is addressing one and the second sentence is addressing the other?

A. The second sentence gives more specifics when the – what's going to happen with the next claim.

Q. Right.

A. Yes.

Q. The second sentence deals with the next claim.

A. Yes.

Q. And the first sentence deals with the situation where you have a claim that is less than the amount is settled or consumed by defense costs is less than what the primary insurance is, and Zurich is saying that it's going to remain excess in that situation, right?

A. Yes.

Pl.'s Resp. Ex. F, S. January Dep. at 49-50. Comerica contends that this testimony proves that the policy language provides no guidance when there is a settlement that exceeds the primary policy limits. However, to accept that argument, one must ignore the sentence, repeated earlier, that "[t]his policy does not provide coverage for any loss not covered by the 'Underlying Insurance' except and to the extent that such loss is not paid under the 'Underlying Insurance' solely by reason of the reduction or exhaustion of the available 'Underlying Insurance' through *payments of loss thereunder*." Def.'s Mot. Summ. J. Ex. 3, Zurich Policy at 2-3 (emphasis added).

The plaintiff cites *Pereira v. NUFIC*, 2006 WL 1982789 (S.D. N.Y. 2006) (unpublished), a case that involves policy language very similar to the language at issue in the present matter. The court there concluded that the excess carrier's interpretation of the policy, which is the same as Zurich's here, was reasonable but found that other interpretations were also reasonable. However, the court failed to explain what other interpretation there could be, and this Court is unable to

discern one. The Court cannot accept the *Pereira* court's reasoning because there is no ambiguity in the condition precedent to attachment of the excess policy in this case.

"An insurance contract is ambiguous when its provisions are capable of conflicting interpretations." *Klapp v. United Ins. Agency Grp.*, 468 Mich. 459, 48, 663 N.W.2d 447 (2003). There is no reasonable way to read this policy to require Zurich to pay unless the Federal policy was exhausted "solely . . . through payments of loss thereunder." The parties could not have been clearer about their intentions. Zurich agreed to cover losses by the plaintiff exceeding $20 million only if Federal first paid $20 million. "[A]n insurance policy must be enforced in accordance with its terms," *Michigan Millers*, 445 Mich. at 558, 519 N.W.2d at 868, and the "court may not read ambiguity into a policy where none exists." *Ibid.*

The plaintiff states that other language in the policy makes clear Zurich's intention that actual payment of losses by the primary insurer is not required to trigger coverage, referring to provisions that allow Comerica to fill the gap with its own payment up to the primary policy limit when (1) the underlying insurance lapses for some reason, (2) the underlying insurer becomes insolvent, or (3) the underlying insurance is exhausted by a claim made before the effective date of the excess policy, when the primary and excess policy dates are not aligned. Of course, none of these provisions applies in this case, and they undermine Comerica's argument that it should be able to fill the gap by its own payment, since the possibility of such an instance apparently occurred to the parties and they chose not to include the present scenario among the circumstances where gap payments by the insured would be acceptable.

To find the Zurich policy ambiguous would essentially require a holding that parties simply cannot contract for an excess policy to be triggered only upon full, actual payment by the underlying

insurer. Comerica could have bargained for a contract under which Zurich agreed to pay for any liabilities over $20 million, even if the underlying insurer did not actually pay the entire $20 million, or when the insured filled the gap, or a settlement extinguished liability up to the primary insurer's limits, or there was an agreement to give the excess insurer "credit" up to the amount of the underlying insurance. However, the present agreement does not say that, and it cannot be rewritten now.

III.

The Court finds that the unambiguous language of the excess policy issued by defendant Zurich required that Comerica's primary insurer in this case, Federal Insurance Company, exhaust its limit of liability by actual payment of claims before Zurich would be obliged to contribute to indemnity or defense costs. That did not occur. Zurich's coverage was never implicated, and it is not liable to Comerica in this case. This disposition obviates a decision on Comerica's motions raising the question whether section 11 damages are covered under the primary (and therefore the following form excess) insurance policy.

Accordingly, it is **ORDERED** that the motion for summary judgment by defendant Zurich American Insurance Company [dkt # 12] is **GRANTED**.

It is further **ORDERED** that the plaintiff's motions for partial summary judgment [dkt #s

30, 31] are **DENIED as moot**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  July 27, 2007

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 27, 2007.

s/Felicia M. Moses
FELICIA M. MOSES